**Michael H. RENAUD, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. CIV.A.03–10024–LPC.**

United States District Court, D. Massachusetts.

May 10, 2004.

Stephen T. Fanning, Providence, RI, for Plaintiff.

Michael H. Renaud

James Ferber, Littler Mendelson, Columbus, OH, Alison Day Hall, Littler Mendelson, Columbus, OH, Jeffrey L. Hirsch, Robinson & Cole, LLP, Boston, MA, Peter J. Moser, Robinson & Cole, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

LAWRENCE P. COHEN, United States Magistrate Judge.

In this case, plaintiff alleged in his complaint that the defendant discriminated against him in violation of the Americans with Disabilities Act and the provisions of G.L. c. 151B.[1] On or about October 9, 2003, all parties executed a Consent Form (AO 85) consenting to the jurisdiction of this court for all proceedings. On that same day, after hearing, this court established a schedule for the completion of discovery and other matters consistent with the provisions of Rule 16(b), F.R. Civ. P. And the case was then referred to this court for all proceedings, including trial and entry of judgment, with the consent of the parties and consistent with the provisions of 28 U.S.C. § 636(c) and Rule 4(c)(1) of the Rules for United States Magistrate Judges

in the United States District Court for the District of Massachusetts.

### I. *Procedural History of Dispute*

On March 15, 2003, counsel for the plaintiff filed a Notice of Attorney's Lien of Attorney (# 17).[2] Shortly thereafter, Renaud,[3] *pro se,* filed a motion to dismiss under Rule 41(b), F.R. Civ. P. (# 20). The notice of attorney lien, and the motion to dismiss, as well as a flurry of motions filed thereafter relating to the question of attorney's fees, were bottomed on the ground that the plaintiff, through the vehicle of an arbitration/grievance proceeding initiated by his union, had reached a settlement.[4] After directing the parties to file additional matters (which included the filing of additional affidavits), this court conducted a hearing on the matter on April 22, 2004, at which all parties (*i.e.,* Renaud, Mr. Manning, and counsel for the defendant, General Motors Corporation) were in attendance and were given the opportunity to be heard.

### II. *Findings of Fact*

 Based on the affidavits and other papers filed, as well as the representation

---

1. Subject matter jurisdiction was and is based on federal question jurisdiction, given the allegations set forth in Count 1 alleging a violation of the Americans with Disabilities Act. Count 2, brought under the provisions of G.L. c. 151B, was and is a pendent state claim.

 The complaint also included two additional state law claims, to wit: Count 3 (intentional infliction of emotional distress) and Count 4 (negligent supervision and training of supervisors). As to those counts, the defendant previously filed a motion to dismiss (# 04). On October 23, 2003, this court allowed that motion to dismiss (# 16) on the grounds that those claims were barred by the exclusivity provisions of the Massachusetts Workmen's Compensation law, G.L. c. 152, § 24, established precedent. *E.g., Choroszy v. Wentworth Institute of Tech.,* 915 F.Supp. 446, 452 (D.Mass.1996).

2. The docket entry erroneously indicates that the name of counsel seeking the lien was Stephen Fleming. The document (# 17) itself clearly indicates that the notice of lien was filed by and on behalf of Stephen T. Fanning, Esq., Renaudis counsel of record then and now.

3. The use of the name Renaud here and hereinafter is meant to distinguish Renaud as the party from his attorney, Stephen T. Fanning, Esq.

4. Although the parties assume that Renaud reached that settlement with the defendant through the arbitration/grievance procedure, it is not quite accurate to say that there was, in fact, a settlement. As this court sees it, the parties reached a settlement in principle (perhaps enforceable), but Renaud has chosen not to execute the formal settlement papers.

of all parties at the hearing, this court makes the following findings of fact:

1. On March 10, 2001, Renaud, contending that the defendant General Motors Corporation discriminated against him on account of his medical impairment, filed a grievance by and through his union, UAW, Local 22;

2. On or about September 10, 2001, the defendant failed again (according to Renaud) to accommodate his medical impairment, constructively causing him to terminate his employment with the defendant;

3. For at least a year and one half, to and through October 3, 2002, there were no fruits borne by the grievance procedure referred to in Paragraph 1.1, above;

4. In February of 2002, Renaud met with Stephen T. Fanning, Esq., an attorney specializing in employment law. Renaud expressed concern that his collective bargaining representatives were not representing his best interests;

5. In his affidavit in support of this motion to enforce an attorney's lien, Mr. Fanning avers, *inter alia:*

 10. On October 3, 2002, Attorney fully explained to the Plaintiff the following fee terms: If the Union were able to resolve Plaintiffs case, prior to Attorney filing suit, Attorney would charge an hourly rate of $225.00/per hour for all services rendered; If it was necessary for Attorney to file suit, prior to any settlement, the Attorney's fee would be a contingency fee equal to one-third (33 and 1/3 %) of all sums realized through *any settlement* or verdict. (See Attachment 2–Paragraph 5(b)) Attorney fully explained, and the Plaintiff indicated that he fully understood, that once Attorney filed suit, the fee arrangement became the contingency agreement referenced above.

 11. Attorney and the Plaintiff agreed, after extensive discussion and review of all factors, that the fee arrangement referenced in the previous paragraph was fair and rea-

5. In March of 2002, Renaud retained Mr. Manning to prosecute an employment discrimination claim. On March 8, 2002, Mr. Manning filed a claim with the MCAD and the EEOC as a predicate to filing suit in the United States District Court for the District of Massachusetts;

6. On October 3, 2002, Renaud formally retained the legal services of Mr. Manning by executing a retainer agreement memorializing the attorney-client relationship. At that time, Mr. Fanning was aware of the ongoing (albeit fruitless) grievance procedure purportedly being pursued by union representatives. For that reason, he explained to Renaud that the terms of the written retainer agreement, and particularly those terms set forth in Paragraph 5 as set forth immediately below, meant that Mr. Fanning was entitled to the full contingency fee if the case settled after he filed suit, even if the settlement was brought about by others;[5]

sonable, in light of the fact that any action by the Attorney to file and process litigation, and to undertake negotiation with the Defendant employer would likely have a positive influence on the prospect of settlement. In addition, Attorney fully explained to the Plaintiff that, when Attorney accepts a case for purposes of litigation, he does so at the exclusion of other potential clients and, by practice, charges a contingency fee for such services.

12. Attorney and Plaintiff agreed that Attorney would be reimbursed for all costs and expenses, and would be paid as compensation for his legal services to the Plaintiff a reasonable fee in the amount of 33 and 1/3%, contingent on *any* recovery through *settlement* or verdict.

13. As part of the pertinent Retainer Agreement, Attorney also included a concise and comprehensive statement as prepared by the Rhode Island Supreme Court, clearly indicating the Plaintiff's rights rela-

7. The retention of the services of Mr. Fanning was memorialized in a written retainer (hereinafter "Retainer Agreement"). Paragraphs 5 and 6 of that formal retainer provided (and still provides) as follows: [6]

5. Client agrees to pay Attorney for all services rendered, as described below:

a. An initial deposit to retain and reserve the services of the Attorney in the amount of $2000, and

b. If Client's case is resolved pursuant to a settlement of all claims pursuant to the contractual grievance/arbitration mechanism, an hourly fee at the rate of $225.00/per hour, to be charged initially against the retainer amount, with all amounts in excess of the retainer amount to billed at the close of the case, or

c. If Client's case proceeds to the stage of an action filed in state or federal court, one-third (33 and 1/3%) of all sums realized through negotiated settlement or verdict.

6. The Client agrees and understands that, notwithstanding the outcome of the case, Client will be responsible for and shall pay as necessary all fees, as referenced in the previous paragraph, and expenses incurred in the handling of the case. Expenses for which the Client is responsible shall include stenographer's fees, investigation expenses, report fees, copying costs, and other expenses reasonably necessary to the processing of the Client's representation. . . .

8. The formal retainer agreement also included a standard integration clause, signifying that it constituted entire agreement between parties; [7]

9. Having heard nothing in terms of an end result in the union grievance procedure, Mr. Fanning upped the ante [8] by bringing suit in this court on January 3, 2003, under the provisions of the Americans with Disabilities Act and the provisions of G.L. c. 151B;

10. On or about June 16, 2003, Mr. Fanning sent a letter to counsel for the defendant offering the terms of a settlement.[9] The terms offered

---

tive to seeking clarification regarding any aspect of the Attorney—Client relationship. (Emphasis added).

In his filings and submissions, Renaud did not dispute any of these averments.

6. Based on that presented in the pleadings filed to date, and the representations made at the hearing before this court, this court finds and concludes that Mr. Fanning drafted Paragraph 5 in the terms shown specifically for the reason that he was aware of the parallel grievance procedure. He drafted Paragraph 5 with the intent to receive his due even if the settlement was the result of that grievance procedure and not formally as a settlement of any lawsuit to be filed.

7. Paragraph 11 of the retainer provided:

11. This Agreement contains the entire agreement between the Client and the Attorney, replaces any prior oral or written agreements, and can only be modified by written agreement signed by the Client and the Attorney, and their respective heirs, legal representatives, and successors.

8. The lawsuit upped the ante because success meant not only a full award of back pay and other benefits to Renaud, but also an award of attorney's fees.

9. The terms offered by Mr. Fanning on behalf of Renaud almost mirrors the terms of the settlement in principle later reached as set forth below—the only difference being that the monetary component of the settlement package offered by the defendant was $110,000 as opposed to the $120,000 proffered by Mr. Fanning.

There is no evidence whatsoever indicating that the union representatives who represented Renaud in the grievance proceedings ever made any offer of settlement or compromise.

by Mr. Fanning on behalf of Renaud almost mirrors the terms of the settlement in principle later reached as set forth below—the only difference being that the monetary component of the settlement package offered by the defendant was $110,000 as opposed to the $120,000 proffered by Mr. Fanning;

11. On February 16, 2004, Mr. Fanning notified counsel for the defendant that he had noticed at least three depositions—the first of which was noticed for March 29, 2004;

12. On March 19, 2004, just ten days shy of the first of the scheduled depositions, the defendant, in the context of the grievance proceedings, offered Renaud the sum of $110,000 in settlement of the claim against the defendant, the consideration being that the plaintiff dismiss (all lawsuits pertaining to this case...). Renaud accepted the offer [10] with the understanding that he would execute a formal settlement document upon preparation of that document;

13. There is no evidence whatsoever in the record before this court indicating that the union representatives who represented Renaud in the grievance proceedings ever made any offer of settlement or compromise—much less one which approached the terms proffered by Mr. Manning and the terms eventually reached;

14. Within days of having reached that settlement, Renaud notified Mr. Manning that his [Manning's] services were no longer needed or desired, and Renaud took the position that he owed Fanning nothing.

III. In the circumstances, this court finds and concludes that Mr. Manning, under Paragraph 5(6) of the Retainer, has an enforceable attorney's lien against the $110,000 offered to the plaintiff should plaintiff (voluntarily or by dint of judicial enforcement) accept that offer in the amount of $36,630, and that Mr. Fanning, under Paragraph 6 of the retainer, is entitled to expenses incurred in prosecution of Renaud's claims before the administrative agencies (EEOC and MCAD) and before this court.

1. Although not addressed by any of the parties, this court concludes that issues relating to the enforcement of an attorney's lien is, in a case before this court based on federal question jurisdiction, governed by federal law. *See e.g., Misek–Falkoff v. International Business Machines Corp.*, 829 F.Supp. 660, 663 (S.D.N.Y.,1993); [11]

---

10. When we say that Renaud accepted this offer, we mean that he executed a document which reflected a ìGrievance Dispositionî. A more formal settlement agreement was presented to Renaud by the attorneys for the defendant in this action. To date, Renaud has balked at signing this formal document.

11. There that court observed (*Id.*):

The nature and extent of an attorney's lien is controlled—certainly in a federal question case, and perhaps in all cases in federal court—by federal law. *Pomerantz v. Schandler*, 704 F.2d 681, 682 (2d Cir.1983)

(*per curiam*), citing *National Equipment Rental Ltd. v. Mercury Typesetting Co.*, 323 F.2d 784, 786 n. 1 (2d Cir.1963).

Insofar as this court can discern, however, the choice of law issue—not addressed by the parties—makes no difference. If this issue was not to be governed by federal law, it would most certainly be governed by the law of the Commonwealth of Massachusetts, since the existence and scope of the enforceable attorney's lien in this case derives its sustenance from a retainer contract between the parties. And, applying Massachusetts' choice of law principles, since the significant interests all favor Massachusetts-*i.e.*, Renaud is a

2. Although there is no controlling authority in this Circuit *vis a vis* the enforcement of an attorney's lien as a matter of *federal* law, this court concludes that federal law would not differ in any respect from the law of the Commonwealth of Massachusetts which, in turn, mirrors the law of most jurisdictions; [12]

3. As a general rule, under Massachusetts law, Rhode Island law, and elsewhere, either under the common law,[13] or by statute,[14] or by both,[15] where the terms of the attorney-client relationship are governed by a valid retainer, the terms of that retainer control, and, absent extraordinary circumstances not present or alleged to be present here,[16] the attorney is entitled to a lien on any settlement or recovery consistent with those terms. *E.g., Benalcazar v. Goldsmith*, 400 Mass. 111, 507 N.E.2d 1043 (Mass.1987); [17]

Massachusetts resident, the contract contemplated performance in Massachusetts (*e.g.*, filing suit in the Massachusetts courts), and the basis of the contemplated law suit concerned Renaud's employment by a Massachusetts' employer at a place within the Commonwealth of Massachusetts.

**12.** Including the law of Rhode Island. *E.g., Cawley v. Burke*, 43 R.I. 188, 110 A. 609 (1920). Mr. Fanning's principle place of business is in Rhode Island, and he is a member of the Rhode Island bar. And the retainer in this case was crafted consistent with the legal and ethical considerations imposed by the Rhode Island Bar authorities.

**13.** The common law roots of the right of an attorney to enforce a lien was underscored by the Massachusetts Supreme Judicial Court in *Boswell v. Zephyr Lines, Inc.*, 414 Mass. 241, 606 N.E.2d 1336, (1993). There that Court observed, *inter alia* (606 N.E.2d at 1341):

> Attorneys' liens are devices, first created by the common law, which help attorneys deal with the oft-encountered reluctance of certain clients to pay for legal fees at the conclusion of a matter. McCann, The Attorney's Lien in Massachusetts, 69 Mass. L.Rev. 68, 68 (1984). As Chief Judge Cardozo aptly put it, the attorney's lien protects attorneys "against the knavery of their clients, by disabling the clients from receiving the fruits of recoveries without paying for the valuable services by which the recoveries were obtained." *Matter of Heinsheimer*, 214 N.Y. 361, 364, 108 N.E. 636 (1915), quoted in *McCann*, supra at 68 n. 1. In other words, the attorney's lien grants the unpaid attorney a tool for recovery of legal fees which surpasses in effectiveness a traditional action in contract or in quantum meruit.

**14.** In Rhode Island, the scope and effect of attorney's liens appear to be driven by statute. *See e.g., Cawley v. Burke*, 43 R.I. 188, 110 A. 609 (1920); *Jacobs v. United Elec. Rys. Co.*, 46 R.I. 230, 125 A. 286 (R.I.1924).

**15.** In Massachusetts, both the common law and statutory law aid the attorney in enforcing an attorney's lien. Where there is a valid retainer with a contingency agreement, it is the terms of that retainer which give rise to the existence and enforcement of the lien. *See Boswell v. Zephyr Lines, Inc., supra*, at note 13. On the other hand, where there is no formal agreement, then an attorney may nevertheless establish an attorney's lien and recover in *quantum meruit* under the provisions of the governing statute (G.L. c. 221, § 50). *See e.g., Gil–Wal Corp. v. Painewebber, Inc.*, 734 F.Supp. 566, 567 (D.Mass.1990).

**16.** For example, controlling case law suggests that if a contingent fee agreement exceeded that allowed by local law relating to attorney practice, an attorney would not be able to posit the retainer agreement as a basis for enforcement of an attorney's lien. That is not the case here, since the contingency arrangement in the retainer was fully consistent with Massachusetts and Rhode Island law.

**17.** There that Court observed, *inter alia* (*Id.* 507 N.E.2d at 1044):

> Mr. Goldsmith claims he is entitled to one-third of $14,923.74, the sum of the back wage loss and the expenses, in *addition* to the $8,300 awarded by the court. We do not agree. The contingent fee con-

4. In this case, Section 5(c)[18] of the retainer agreement clearly applies. As contemplated by the retainer as a whole in general, and in terms of Paragraph 5(c) in particular, the case *did* proceed (...to the stage of an action filed in state or federal court...)[19]

5. Since, consistent with the unequivocal language of Paragraph 5(c) of the retainer, Mr. Fanning did prosecute the case to the point of filing the federal action[20] and pursuing discovery in connection with that suit, Mr. Fanning, by the same unequivocal language of Paragraph 5(c) of the retainer, is entitled to 33 ⅓ percent of any recovery or settlement of the underlying claim, and this court so concludes and holds.[21]

IV. Accordingly, it is hereby ordered as follows:

(a) The Motion Seeking Determination and Enforcement of Attorney's Lien for Contingent Fee (# 25) is allowed to the following extent: The plaintiff, Michael H. Renaud shall pay to his attorney, Stephen T. Fanning, Esq., (1) a sum representing one-third of any recovery in connection

---

tract between Benalcazar and Mr. Goldsmith provides that "[t]he Client agrees to pay to the firm a Thirty–Three and one-third (33 1/3) percent contingent recovery for any compensation, back pay, attorneys fees, or damages recovered in addition to the above hourly rate." The contract also provides that "[i]n the event Attorney Goldsmith is successful at obtaining attorney fees to cover the costs of pursuing this action or any appeals, then the client shall not be responsible for the payment of the $15.00 hourly rate ... above the $1,750.00 [paid as the retainer]." The contract finally provides that "[t]he firm retains its right to the one-third contingent recovery," and that "[i]n the event the Court awards and the Defendants pay attorney fees, such fees shall be paid directly to the firm." (Emphasis added).

The Court accordingly endorsed the principle that an attorney was and is entitled to a lien on a recovery or settlement consistent with the contingency terms of the retainer agreement—nothing more, and nothing less.

18. To wit:

c. If Client's case proceeds to the stage of an action filed in state or federal court, one-third (33 and 1/3%) of all sums realized through negotiated settlement or verdict.

19. Indeed, beyond the stage of mere filing. When Renaud purportedly settled the matter without consultation of Mr. Fanning, three or four depositions loomed in the wings, the first of which was scheduled just ten days after Renaud purportedly settled the matter.

20. Not to mention the proceedings before the EEOC and the MCAD as predicates for bringing the action in the federal courts.

21. Renaud apparently is of the view that Mr. Fanning did not cause the settlement which, according to him, came about in the context of the union grievance proceeding. But even if his view was the correct view, the retainer agreement clearly provided that Mr. Fanning was due his 33⅓ percent of the recovery or settlement regardless of the venue where that occurred. More importantly, the factual predicate is simply wrong. The record evidence before this court shows absolutely no action taken by his union representatives which resulted in the offer of settlement by the defendant. In contrast, that same record evidence shows that Mr. Fanning was the moving cause for the settlement. Until he took over the reins, Renaudis attempts to secure his due through the grievance proceedings stood dead in the water. It was only when Mr. Fanning upped the ante by filing suit (which included a potential recovery of attorney's fees in addition to compensatory damages), followed through with a reasonable proposal for settlement, and tightened the screws yet another notch by noticing three or four depositions, the first of which was scheduled for just ten days after the defendant capitulated with an offer of settlement (and which almost mirrored the proposal earlier made by Mr. Fanning), that the offer of settlement was made by the defendant. It is clear beyond peradventure on this record that Mr. Fanning, and no one else, toted the laboring oar in bringing about the settlement in issue.

**84**

with the claim underlying the above-entitled action, regardless of whether that recovery is by way of settlement or verdict and judgment, and regardless of whether any settlement is made in the context of this action, in the context of the parallel grievance proceeding brought on his behalf by his union representatives, or otherwise; and (2) a sum representing all reasonable expenses incurred by the said Stephen T. Fanning, Esq., in connection with the prosecution of the claim before the MCAD, the EEOC, and this court, including, but not limited to, filing fees, stenographer's fees, investigation expenses, report fees, copying costs, and other expenses reasonably necessary to the prosecution of plaintiff's claims;[22]

(b) The Motion to Dismiss (# 20) filed by Michael H. Renaud *pro se* is denied without prejudice to refiling upon compliance with the order of this court set forth immediately above;

(c) The Motion to Withdraw as Attorney (# 31) filed by Stephen T. Fanning, Esq., is allowed. Allowance of this motion, however, shall not affect Mr. Fanning's entitlement to enforcement of his attorney's lien as set forth in Paragraph IV(a) above.

So ordered.

---

22. By this order, this court does not make any ruling as to whether the agreement reached by Renaud, his union representative (Mark Ridenour, UAW Local 422), and the defendant herein (by Rocky Nittoli), on March 19, 2004, is enforceable. On the day of the hearing before this court, defendant General Motors Corporation tendered in open court its Defendant's Motion to Enforce Settlement (# 29). This court denied that motion in open court. The denial of that motion, however, should not be construed as a ruling on the merits—*i.e.*, that ruling should not be construed as holding that the agreement is not enforceable. This court declined to entertain that motion, and still so declines, for the reason that the validity of that agreement, and the extent to which it is enforceable, is, since it was struck in the context of a union grievance proceeding, to which the union was a party and privy, indeed, to which the union was the moving party, is a matter best decided in a different forum based on independent subject matter jurisdiction. When the motion was brought before this court, the union, a party signatory to the agreement in issue, was not a party before this court and, indeed, did not even receive notice of the motion. Whether this court, in the context of an independent proceeding, would have subject matter jurisdiction, is a matter more appropriately left for that court in which an independent action is brought.

In the event that the said Michael H. Renaud fails to comply with the terms of this order, the said Stephen T. Fanning may apply for the issuance of an order directing the said Michael H. Renaud to show cause why he should not be held in contempt of court for failure to comply with the order of this court. *See* 28 U.S.C. 636(e).